IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDWARD JOHN PALLIES | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| LENAPE VALLEY FOUNDATION, | : | 25-735 |
| et al. | : | |

MEMORANDUM

Bartle, J.                                              April 13, 2026

Plaintiff Edward John Pallies, a New Jersey resident, has filed suit against his former employer Lenape Valley Foundation ("Lenape"), its CEO Sharon Curran, and its Senior Executive Director of Human Resources Traci Gorman-Donnon ("Ms. Gorman").  He alleges that the defendants retaliated against him in violation of the Pennsylvania Whistleblower Law ("PWL"), 43 Pa. Cons. Stat. §§ 1421-28.[1]  Before the court is the motion of the defendants for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

I

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there

---

[1]   In his complaint, plaintiff also alleged that defendants retaliated against him in violation of the New Jersey Conscientious Employee Protection Act and the New Jersey Law Against Discrimination ("NJLAD").  He further averred that defendants discriminated against him on the basis of his gender in violation of the NJLAD.  In his opposition to defendants' motion for summary judgment, plaintiff states that he is no longer pursuing his claims under New Jersey law.  Only his whistleblower claim under Pennsylvania law remains.

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).  The court views the facts and draws all inferences in favor of the nonmoving party.  See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

Summary judgment is granted when there is insufficient record evidence for a reasonable factfinder to find for the nonmovant.  See Anderson, 477 U.S. at 252.  "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]."  Id.  In addition, Rule 56(e)(2) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(2).

## II

Defendant Lenape is a group medical practice and 501(c)(3) organization located in Bucks County, Pennsylvania. It receives grant funding from the county as well as other

government funds in the form of Medicaid and Medicare reimbursements.

Plaintiff was hired as Lenape's Chief Financial Officer in June 2021.  He was responsible for keeping track of Lenape's finances, developing budgets and financial reports, assuring compliance with fiscal regulations and accounting principles, and providing timely and accurate reports to Lenape's Board of Directors.  He oversaw several accountants, including Anita Duscher.  Plaintiff reported directly to Ms. Curran, Lenape's CEO.

In April 2022, plaintiff became aware of unreconciled items on Lenape's books and discussed it with several subordinates, including Ms. Duscher.  Plaintiff initially believed that the amount of unreconciled items was minor.  An investigation by Lenape's Controller, Joe Paskus, revealed that Ms. Duscher had adjusted over $80,000 to "unapplied cash" because she could not correct issues in the accounting software Lenape used at the time.  In May 2022, Plaintiff reported this situation to Ms. Curran.  He recommended that Ms. Duscher be terminated, but this did not occur.  He also told Ms. Gorman about what had happened, but not Lenape's Board of Directors or anyone else.

Plaintiff discussed this incident with Ms. Duscher as well.  He noted in a July 26, 2022 follow-up email to her that

3

"it is not acceptable to plug unidentified reconciling items to make the cash account balance due to time restraints."  He further instructed her to identify such issues and forward them to him for resolution.  Ms. Duscher responded that she had previously "plugged" numbers at the direction of the prior CFO.

Over the next several months, Ms. Duscher was unable to complete accurately the latest reconciliations.  Plaintiff then assigned Mr. Paskus, the Controller, with this task.  The reconciliations were rectified before such information was included in any financial reports.  No audits were adversely affected.

In December 2022, plaintiff provided a performance improvement plan ("PIP") for Ms. Duscher as requested by Ms. Gorman.  He also drafted and sent a timeline titled "Anita Duscher Plan of Correction Timeline" to Ms. Curran and Ms. Gorman.  In addition, he forwarded to them a number of emails he exchanged with Ms. Duscher regarding the reconciliations.  Ms. Duscher was never placed on a PIP.  Sometime in January 2023, plaintiff stopped discussing his concerns about Ms. Duscher's performance with Ms. Curran and Ms. Gorman because, in plaintiff's own words, the plan they suggested to train and

place her on a PIP was "a waste of time" and "would have no impact."  Plaintiff was not allowed to fire Ms. Duscher.[2]

Lenape hired an outside accounting firm to conduct an annual review of Lenape's financial statements.  All information in Lenape's financial statements was corrected prior to being supplied to the auditor.  Following conversations with Ms. Curran and Mr. Paskus and upon the belief that "there was nothing that impacted the financial statements," plaintiff had no reason to advise Lenape's auditor that fraud was occurring. In connection with the audit, plaintiff executed the auditor's representation letter in February 2023 for the purpose of assuring the auditor that the financial statements were "presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States of America (U.S. GAAP)."  The letter also included a statement that Lenape had no knowledge of fraud or suspected fraud.  Plaintiff did not review financial statements from prior years to determine whether they were correct.  The auditor did not find any fraudulent conduct.

---

2    Plaintiff alleges in his amended complaint that Ms. Gorman instructed him that "because Plaintiff and Mr. Paskus were men, it would 'look bad' for them to terminate Ms. Duscher, a woman." During his deposition, he clarified that he was never told by either Ms. Gorman or Ms. Curran that he could not discipline Ms. Duscher because she was a woman, and he was a man.

Plaintiff received a positive performance review on November 29, 2022 from Ms. Curran.  At her direction, he received bonuses and salary increases based on that review.

At various times before and after November 2022, at least two of plaintiff's subordinates, including Ms. Duscher, raised complaints about plaintiff's behavior to Ms. Gorman.  Plaintiff was aware that Ms. Duscher complained about him to HR, but he did not know the specifics.  On March 14, 2023, plaintiff was called into a meeting to discuss the complaints with Ms. Curran and Ms. Gorman.  Ms. Gorman sent plaintiff a follow-up email, which included a plan to address these issues with his staff.  Plaintiff does not dispute that he and Ms. Gorman met to discuss that staff felt targeted by him and that some of the women who worked for him thought he treated them "differently" than men.  By March 14, 2023, plaintiff believed he would likely be fired.

On March 16, 2023, Ms. Curran placed plaintiff on a PIP because he failed to provide appropriate leadership to his department.[3]  The PIP noted that "[a]ny further violations of this policy or any other [Lenape] Policy or procedure will result in further disciplinary action, up to and including

---

[3]    The PIP document itself details the complaints from plaintiff's subordinates, but there are no contemporaneous documents of the complaints in the record.  While the PIP lists Ms. Curran as plaintiff's supervisor, it is unsigned.

termination."  That same day, he met with his staff members and apologized for his behavior.  Less than a week later, on March 21, 2023, plaintiff attended but was asked to leave a board meeting.

Surmising that he was about to be fired, plaintiff, the next day, March 22, 2023, e-mailed members of Lenape's Board[4] and Ms. Curran regarding his PIP.  He referenced his May 2022 report on Ms. Duscher and Ms. Gorman's response to his recommendation that Ms. Duscher be fired.  He added that he repeatedly recommended that Ms. Duscher be terminated after she was placed on a PIP because she continued to engage in fraudulent behavior.[5] He stated that he "worked diligently attempting to ensure that [Ms. Duscher] and others in the accounting department fulfill their job responsibilities and do not engage in fraud and perform competently, and yet every time [plaintiff reports] their failures and fraud, [he is] dismissed explicitly because of [his] gender" and that it was "clear that this PIP is pure retaliation for expressing [plaintiff's]

---

4    The p[arties acknowledge that although the greeting states "Dear Executive Committee," plaintiff sent the email to members of Lenape's Board of Directors.

5    As noted above, plaintiff testified during his deposition that he was aware that Ms. Duscher had never been placed on a PIP.  Plaintiff also testified that, after a meeting with Ms. Curran and Ms. Gorman in January 2023, he did not take any further steps to discipline Ms. Duscher.

concerns of unlawful business practices and gender discrimination."

Plaintiff separately sent a text on March 22, 2023 to Ms. Curran advising her that he needed to use a sick day because of his sciatica. However, the parties dispute whether Ms. Curran received this text. In any event, Ms. Curran that day asked Lenape's IT department to determine if plaintiff was working remotely.

Emails that were found during this review showed that a week prior, plaintiff sent an email to request and obtain sensitive patient information from his former employer, John Brooks Recovery Center ("John Brooks"). Plaintiff had done so during regular business hours and using Lenape's email servers. Both Lenape and John Brooks received grants from the government during the COVID-19 pandemic and were later required to submit reports related to those grants. During his employment with Lenape, plaintiff worked as a contractor for John Brooks to "respond to a pandemic-era grant." He testified that he had Ms. Curran's approval to do so. Ms. Curran testified only that she was aware that plaintiff had previously been in contact with John Brooks to exchange information on how to complete the required reports.

On March 23, 2023, plaintiff went to work at Lenape's office in Bucks County. His key card no longer worked.

8

Lenape's maintenance man told him that he had been terminated. A day or so later, plaintiff also received a termination letter dated March 23, 2023 and signed by Ms. Curran, his supervisor and Lenape's CEO, and witnessed by Ms. Gorman.   The letter stated that: (a) plaintiff was placed on a PIP on March 17, 2023 for "failure to provide appropriate leadership in his Department"; (b) plaintiff did not inform Ms. Curran that he would be taking the day off; (c) a review of his computer and email activity showed that he was working for his former employer on Lenape equipment and during Lenape work hours; (d) the email review showed he stored protected health information he received from his other employer on Lenape equipment and servers; and (e) plaintiff forwarded sensitive personnel records of a former employee to his personal e-mail account.

III

To prove a violation of the Pennsylvania Whistleblower Law, a person must establish:

> by a preponderance of the evidence that, prior to the alleged reprisal, the employee or a person acting on behalf of the employee had reported or was about to report in good faith, verbally or in writing, an instance of wrongdoing or waste to the employer or an appropriate authority.

43 Pa. Cons. Stat. § 1424(b).  The law defines "wrongdoing" as:

> A violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a

9

> code of conduct or ethics designed to
> protect the interest of the public or the
> employer.

Id. § 1422.  The law defines an employer to include not-for-profit corporations that "receive[] money from a public body to perform work or provide services relative to the performance of work for or the provision of services to a public body."  Id. The parties do not dispute that Lenape is an employer as defined by the PWL.  As it received Medicare and Medicaid funding, Lenape is considered a "public body."  Denton v. Silver Stream Nursing & Rehab. Ctr., 739 A.2d 571, 575-76 (Pa. Super. 1999); see also Gloukhova v. CSL Behring LLC, No. CV 22-2223, 2022 WL 16722314, at *4-6 (E.D. Pa. Nov. 4, 2022); Carter v. Angels of Care, LLC, No. CV 24-790, 2024 WL 3444617, at *5-6 (E.D. Pa. July 16, 2024).

A plaintiff may recover under the PWL if the plaintiff demonstrates that he or she "made a report of some action by [his or her] employer or its agent, which, if proven, would constitute a violation of a law or regulation."  Greco v. Myers Coach Lines, Inc., 199 A.3d 426, 434 (Pa. Super. Ct. 2018).  A plaintiff may also recover if he or she demonstrates that the reported action violated an employer's internal code of conduct that "the employer is charged to enforce for the good of the public or is one dealing with the internal administration" of the public body in question.  See Gray v. Hafer, 651 A.2d 221,

10

224 (Pa. Commw. Ct. 1994), aff'd, 669 A.2d 335 (Pa. 1995); Waller v. Habilitation Grp., LLC, No. 2:21-CV-00519-CCW, 2022 WL 17105493, at *8 (W.D. Pa. Nov. 22, 2022).

Mere attempted wrongdoing or belief that wrongdoing occurred is insufficient. See Greco, 199 A.3d at 433-34. An actual violation is required. Id. at 434. Furthermore, the Pennsylvania Supreme Court has explained that there must be a "causal connection between the report of wrongdoing and the termination" through "concrete facts or surrounding circumstances but not by the employee's conclusory perception of how others treated him after making a report of alleged wrongdoing." Javitz v. Luzerne Cnty., 293 A.3d 570, 579, 582 (Pa. 2023) (citation modified).

The first statute that plaintiff alleges that defendants violated and on which he bases his whistleblower claim is 10 Pa. Cons. Stat. § 162.5(b), (f)-(g). It requires officers of charitable organizations, including entities with tax exempt status like Lenape, to file certain registration statements, financial reports, and fees. 10 Pa. Cons. Stat. § 162.5(b). A charitable organization receiving more than $100,000 in annual contributions is required to be audited by an independent certified public accountant ("CPA") or public accountant. Id. 162.5(f). The audits must be "performed in accordance with generally accepted auditing standards, including

11

the Statements on Auditing Standards of the American Institute of Certified Public Accountants." Id. Government audits of government grants must also be included as part of financial statements. Id. 162.5(g). Nothing in the record shows that Lenape failed to file the required reports or that audits were not conducted as required by "generally accepted auditing standards." The only standard that plaintiff points to is the United States' Generally Accepted Accounting Principles ("U.S. GAAP"), which is published and maintained by the Financial Accounting Standards Board ("FASB"), a private and independent body that sets standards for financial accounting and reporting. Plaintiff, citing FASB's Statement of Financial Accounting Concepts No. 8 ("Concepts Statements") as amended in August 2018, argues Lenape violated a US GAAP provision that states financial information should be "complete, neutral, and free from error."

Our Court of Appeals has previously acknowledged that whether the FASB's Concepts Statements "constitute[] GAAP is best resolved by expert testimony." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1421 (3d Cir. 1997) (citing In re Discovery Zone Sec. Litig., 943 F. Supp. 924, 935 n.9 (N.D. Ill. 1996)). Plaintiff has not offered any expert testimony on whether the Concepts Statement he cites is a GAAP. The introduction to the Concepts Statements specifies that they

12

"are not part of the FASB Accounting Standards Codification[], which is the source of authoritative GAAP recognized by the FASB to be applied by nongovernmental entities."[6]  The introduction further explains that the Concepts Statements are intended to guide the FASB in developing accounting and reporting guidance. While the principle that reported financial information should be "free from error" is likely incorporated into some authoritative GAAP, plaintiff still has not specified what GAAP provision the defendants purportedly violated.

The Court of Appeals also explained that "GAAP is not a set of rigid rules ensuring identical treatment of identical transactions" and observed that it "includes broad statements of accounting principles amounting to aspirational norms as well as more specific guidelines and illustrations."  Id. at 1421 n.10 (citation modified).  Plaintiff has not produced any evidence, expert or otherwise, of a violation of GAAP by any of the defendants.

Plaintiff, in addition, alleges that defendants violated 18 Pa. Cons. Stat. § 4107(a)(11)(i), which states that it is illegal when a person, in the course of business:

> provides false or misleading information to [a] certified public accountant, public accountant or public accounting firm [with

---

6    Plaintiff included an excerpt of the Concepts Statements, which did not include this explanation, as an exhibit to his briefing.  The court takes judicial notice of the full Concepts Statements No. 8 as amended in August 2018.

whom they are in a client relationship] in connection with performance of an attestation function for the client which results in an attestation by the certified public accountant, public accountant or public accounting firm of a materially misleading financial statement, audit, review or other document.

Nothing in the record, however, suggests that defendants furnished false information to Lenape's CPA, public accountant, or public accounting firm. Plaintiff testified that he discovered and corrected the purportedly false reconciliations made by his subordinate before they were ever incorporated into reports.

Finally, for the first time in his opposition brief, plaintiff argues that Ms. Duscher's conduct violated Lenape's internal Standards of Conduct. He points out that they require: "conform[ing] to ethics codes for [employees'] respective professions"; "ensur[ing] claims payments are properly applied to [Lenape's] books and records"; and "issu[ing] statements and other communications that are accurate, complete, truthful, and that comply with applicable laws, regulations, and guidelines." Plaintiff does not identify any particular violation of the ethics codes related to Ms. Duscher's profession. That being said, there is evidence that Ms. Duscher's conduct, which plaintiff reported to Ms. Curran, violated the other two provisions of Lenape's Standards of Conduct when she "plugged" numbers as directed by Lenape's prior CFO in previous years.

14

Plaintiff argues that his continuous reports about Ms. Duscher's conduct to Ms. Curran and Ms. Gorman and his email on March 22, 2023 to Lenape's Board with a copy to Ms. Curran had a causal connection to the issuance of his PIP and to his termination.  See Javitz, 293 A.3d at 579.  Plaintiff first reported Ms. Duscher's conduct to Ms. Curran in May 2022.  Over the next eight months, he repeatedly raised and discussed the issue with Ms. Curran and Ms. Gorman.  During this same time, plaintiff received a positive performance review, bonuses, and at least one salary increase from Ms. Curran.  By sometime in January 2023, plaintiff stopped discussing this topic with Ms. Curran and Ms. Gorman, and he thought that any further effort to discipline Ms. Duscher was "a waste of time."  Plaintiff maintains that he suffered "swift and sudden reprisal at the hands of Defendants" following his reports to Ms. Curran and Ms. Gorman when he was issued what he characterizes as an "unwarranted and unmeritorious PIP" on March 16, 2023.  On March 21, 2023, he was asked to leave a board meeting.

Plaintiff escalated his concerns about Ms. Duscher's conduct and Ms. Curran and Ms. Gorman's handling of his concerns when he e-mailed his report to Lenape's Board of Directors on March 22, 2023.  The next day, Ms. Curran, who had received a copy of plaintiff's e-mail to the Board, signed plaintiff's termination letter. Considering the record in the light most

15

favorable to the plaintiff, there is more than a "scintilla of evidence" for a reasonable jury to find that there was a causal connection between plaintiff's reports to Ms. Curran, Ms. Gorman, and the Board and the adverse employment actions taken against him.  Plaintiff has thus established a prima facie case for his PWL claim.

The burden then shifts to Lenape to come forward with evidence that the plaintiff was terminated for "separate and legitimate" reasons.  See Javitz, 293 A.3d at 579 n.10.  As noted above, plaintiff's termination letter recounts the reasons for his termination.  They include the PIP that was issued to him, plaintiff's purported failure to inform his supervisor that he would not be coming into work the day he emailed the Lenape Board, his mishandling of protected health information and sensitive personnel records, and his additional employment with his former employer.  The letter also states that such behavior is "an egregious violation of [Lenape's] Electronic Access and Computer Use Policy."  Plaintiff's PIP had placed him on notice that any further violations of Lenape's policies could result in termination.

Because defendants have produced evidence that they had separate and legitimate reasons for plaintiff's termination, the burden shifts back to plaintiff to show that these reasons were pretextual.  See Javitz, 293 A.3d at 579 n.10.  There are

16

some genuine disputes of fact regarding the reasons noted in plaintiff's termination letter.  The termination letter notes that plaintiff was recently placed on a PIP, which outlines several complaints and concerns regarding plaintiff's behavior. Plaintiff maintains that the PIP was "unmeritorious" and that there is no documentation of any of the underlying complaints. While plaintiff says he informed Ms. Curran that he was taking a sick day via text, Ms. Curran says she did not receive the text. Plaintiff claims he had Ms. Curran's approval to work as a contractor for John Brooks.  Ms. Curran denies this.  Plaintiff denies storing personal health information he received from John Brooks on Lenape's servers, and no evidence shows that he did so.  The only part of the letter that does not appear to be disputed is that plaintiff forwarded the personnel file of a former employee to plaintiff's personal email.  It is unclear from the record whether this factor alone would suffice to terminate him.  This conflicting evidence creates genuine issues of material fact as to the reasons for his termination.

Accordingly, the motion of defendants for summary judgment is granted as to plaintiff's whistleblower claims predicated on any violation of laws or regulations by defendants.  The motion for summary judgment is denied with respect to plaintiff's claims that his termination was a result of his reports on violations of Lenape's Standards of Conduct.

17